**UNITED STATES of America,
Plaintiff,**

v.

**Alexis CANDELARIO–SANTANA,
Defendant.**

**Criminal No. 09–427 (JAF).**

United States District Court,
D. Puerto Rico.

Jan. 8, 2013.

Jose A. Contreras, United States Attorneys Office, District of Puerto Rico, San Juan, PR, for Plaintiff.

## MEMORANDUM OPINION

JOSÉ ANTONIO FUSTÉ, District Judge.

This matter comes before the court as a pre-trial determination whether the Defendant, Alexis Candelario–Santana ("Defen-

dant" or "Candelario–Santana"),[1] is mentally retarded for the purposes of *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and the Federal Death Penalty Act, 18 U.S.C. § 3596(c).[2] The court held three days of evidentiary hearings on this matter, on December 6, 7, and 21.[3] Having carefully considered the parties' arguments, the evidence before us, and the pertinent case law, this court now issues its opinion.[4]

# I.

## Introduction

### A. Standards and Burden of Proof for Pre–Trial Determination

The government has notified the parties of its intent to seek the death penalty in this case. (Docket No. 458.) Candelario–Santana argues that because he is mentally retarded, the government cannot seek the death penalty. (Docket No. 564 at 140–145.) Both parties agree that the Defendant bears the burden of proof on this issue by a preponderance of the evidence, and that logically, the issue should be re-

solved before trial begins.[5] Every district court that has addressed the issue that we are aware of has held the same. *See, e.g., United States v. Smith*, 790 F.Supp.2d 482, 484 (E.D.La.2011) (allocating burden of proof to defendant by preponderance of the evidence standard and resolving before trial); *United States v. Sablan*, 461 F.Supp.2d 1239, 1242 (D.Colo.2006) (establishing same burden of proof and ruling that determination be made before trial).[6]

### B. Definitions of Mental Retardation

In *Atkins*, the Supreme Court held that execution of mentally retarded persons violates the Eighth Amendment's prohibition of "cruel and unusual punishments." 536 U.S. at 311, 316–21, 122 S.Ct. 2242 (quoting U.S. Const. Amend. VIII). The Court twice discussed clinical definitions of mental retardation, *see id.* at 308 n. 3, 318, 122 S.Ct. 2242, but did not provide a definition. *Id.* at 317, 122 S.Ct. 2242. After surveying a recent history of executions, the Court held that a national consensus had developed against executing persons with a "known IQ less than 70," a practice that

1. Mr. Candelario–Santana Santana's brother, Wilfredo Candelario–Santana, is a co-defendant in this indictment. All references to "Candelario–Santana" are to Alexis Candelario–Santana unless otherwise noted.

2. Consistent with *Atkins,* the Federal Death Penalty Act provides that "[a] sentence of death shall not be carried out on someone who is mentally retarded." 18 U.S.C. § 3596(c).

3. The minute entries and transcripts of these hearings can be found at Docket Nos. 697; 698; 700; 706; 733; 734. Throughout this order, we refer to the transcripts as "Dec. 6 TR," "Dec. 7 TR," and "Dec. 21 TR."

4. On December 28, 2012, we issued a line order, announcing our decision that Defendant is not mentally retarded. (Docket No. 736.) This memorandum opinion explains the reasons for our decision.

5. In his motion, Defendant requests a pretrial hearing "where the defendant bears the burden of establishing MR/ID by a preponderance of the evidence." (Docket No. 564 at 145.)

6. We agree that deciding this issue before trial is logical, but we have found no case that demonstrates it must be so as a matter of law. A case might arise in which this issue is deferred to the penalty phase. We also note that there is no consensus as to whether the issue is foreclosed once decided by the judge. We note that it would make no sense for the issue to remain open, other than on appeal. Nor do we decide now whether Defendant may seek to introduce evidence of his low IQ as mitigating evidence during the penalty phase.

had become "truly unusual." *Id.* at 316, 122 S.Ct. 2242. The Court acknowledged that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." 536 U.S. at 317, 122 S.Ct. 2242. The Court therefore left "to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences." *Id.* (quoting *Ford v. Wainwright,* 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986)). The Court also cited a clinical definition of "mild" mental retardation, a condition "typically used to describe persons with an IQ between 50–55 and approximately 70." *Id.* at 308 n. 3, 122 S.Ct. 2242 (citing AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS: DSM–IV 42–43 (4th ed.2000) (hereinafter DSM–IV)).

In discussing two "similar" definitions provided by the American Association on Mental Retardation ("AAMR") and the American Psychiatric Association ("APA"), the Court noted that "clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." [7] *Id.* at 318, 122 S.Ct. 2242. When asked in court, both parties agreed that an individual must meet each of these three prongs in order to be considered mentally retarded. We agree.

■ It is important to note that while "the Supreme Court in *Atkins* could have adopted the clinical standard" for defining and evaluating mental retardation, "it explicitly declined to do so." *Hooks v. Workman,* 689 F.3d 1148, 1168 (10th Cir.2012). Thus, our analysis need not rigidly adhere to the clinical standards. Though the clinical standards have informed our analysis, we emphasize that "a clinical standard is not a constitutional command." *Id.* In evaluating Defendant's claim, therefore, we have taken our primary guidance from Supreme Court precedent in *Atkins* and helpful expert testimony. After extensive deliberation, and for the reasons explained below, we conclude that Candelario–Santana is not mentally retarded.

## II. *Candelario–Santana's Background*

Candelario–Santana is a forty-one year old male from Puerto Rico. The following background, unless otherwise noted, is derived from pages seven through twelve of the report by Dr. María T. Margarida Juliá ("Dr. Margarida").[8] Candelario–Santana was the fourth of eleven children born to his mother, Adelaida Santana Pinto, who produced children from five different unions. Candelario–Santana's father, Hipólito Candelario–Santana, abandoned Candelario–Santana's mother when Defendant was very young, and had very little contact with him. When Candelario–Santana was twelve years old, his mother sent him to Florida to live with his father, but Candelario–Santana soon returned home to Puerto Rico, because he and his father did not get along. Candelario–Santana had very little contact with his father after that.

Candelario–Santana was raised in Barrio Sabana Seca, in Toa Baja, in an area

---

7. Defendant's expert, Dr. Stephen Greenspan, also refers to these two definitions as "highly similar." (Def. Exh. 10 at 5.) Dr. Greenspan also endorses Dr. Margarida's definition of mental retardation as involving these three "prongs." *Id.*

8. A copy of Dr. Margarida's report has been admitted into evidence as Defendant's Exhibit 2 ("Def. Exh. 2" or "Marg. Rep.").

known as "The Mangos." The neighborhood he grew up in was filled with violence, drug sales, and frequent shootings. At one point, Candelario–Santana watched his uncle, Jorge, die after being shot in a dispute over a watch. The police would frequently enter the home where Candelario–Santana grew up, searching for fugitives. The home where Candelario–Santana and his siblings lived was a two-bedroom dilapidated house made out of wood. The house was located in a larger plot of land owned by Candelario–Santana's aunt. The aunt lived in a larger house on the same plot of land. Conditions in Candelario–Santana's house were very poor; he says that his family suffered from hunger.

There are very few school records available from Candelario–Santana's childhood. Candelario–Santana apparently told Dr. Margarida that he dropped out of school in the seventh grade, because of his frustrations as a "slow learner." In his interview with the government's experts, Dr. Jaime Herrera Pino ("Dr. Herrera"), and Dr. Jaime Grodzinski Schwartz ("Dr. Grodzinski"), Candelario–Santana provided an additional explanation for his decision to drop out, which was his desire to work and help his mother overcome their family's poverty.[9]

Later during the hearing, the court saw a diploma indicating that Candelario–Santana had finished the ninth grade.[10] The few available records suggest that Candelario–Santana likely repeated one grade in school, though it is unclear which grade, or the reasons behind that circumstance.

There are also several indications that Candelario–Santana never applied himself in school. He told Dr. Zahira Lespier Torres ("Dr. Torres"), a psychologist who interviewed him in 2008, that he used to "cut classes."[11] Candelario–Santana admitted to Dr. Herrera that he was often reprimanded for misbehaving and asked to leave the classroom.[12] Candelario–Santana also indicated to Dr. Herrera that he often behaved in ways that were distracting to other students in the class. To Dr. Grodzinski, Candelario–Santana admitted that his economic and family worries were continuously distracting him from his studies and that his school attendance dropped because of family-related concerns. He also told Dr. Grodzinski that he liked to learn Spanish and Science. Candelario–Santana told Dr. Grodzinski that despite his family's poverty, he remembers being playful, having a lot of fun going out with friends, and enjoying fighting other kids in his neighborhood.

At some point between the ages of fifteen and seventeen years old, Candelario–Santana moved to New York.[13] While in New York, he worked for one year in a full-time job at a factory.[14] His sister Mildred worked at the same factory.[15] Af-

---

9. This explanation is provided in Dr. Grodzinski's report, entered as Defendant's Exhibit 11, at pages 2–3.

10. Government's Exhibit 4.

11. An English translation of Dr. Torres' report is available as Government's Exhibit 14.

12. This can be found in Dr. Herrera's report, produced as Defense Exhibit 13, page 3. (Def. Exh. 13 at 3.)

13. Dr. Grodzinski's report indicates that Defendant was fifteen years old when he moved to Brooklyn. (Def. Exh. 11 at 3.) Dr. Margarida's report suggests that Defendant was seventeen at the time of his move to New York.

14. Dr. Grodzinski's report describes this as a windows factory, while Dr. Margarida's report describes it as a packing factory. Def. Exh. 11 at 3; Def. Exh. 2 at 11.

15. Def. Exh. 2 at 11.

ter a year, he returned to Puerto Rico.[16] In addition to his job in the factory, Candelario–Santana has had an assortment of other part-time jobs, including working in construction, where he earned $120 per week after dropping out of the seventh grade;[17] landscaping, when he lived in Detroit; performing odd jobs at stables, where he took care of horses for three years;[18] and driving a truck to transport merchandise.[19] On one occasion, Candelario–Santana was able to save enough money to buy his own truck. When he was twenty-two years old, Candelario–Santana obtained a driver's license, which he still has. Though he has had no formal training, Candelario–Santana says he knows how to fix a car and change filters and brake pads. At some point, he also received a license to operate heavy equipment.

Candelario–Santana also stated that between the ages of eleven and thirty-eight years, he enjoyed boxing and would sometimes train every day. Even though he used protection, Candelario–Santana says that he received several head concussions during training and fights. He estimates that he suffered approximately ten to twenty concussions, which caused an altered state of consciousness and brief confusion. Also, when Candelario–Santana was twenty years old, he suffered a head injury in a motorcycle accident in which he claims to have temporarily lost consciousness. Upon regaining consciousness, he rode his motorcycle home. There are no medical records available regarding the injury.

While the exact chronology is unclear, Candelario–Santana has moved to and from Florida; Puerto Rico; Brooklyn, New York; and Detroit, Michigan, throughout his life. For most of his life, Candelario–Santana has lived either with his relatives or the mothers of his children.

Candelario–Santana has five children from two different unions. When he was sixteen or seventeen years old, Candelario–Santana married Sonia Benítez, with whom he has two children, now twenty-three and twenty-two years old. His second relationship with Isabel Ocasio produced three more children, all of whom live in Detroit.[20] Individuals who know Candelario–Santana indicate that he is "a good father as far as people can tell."[21]

This court also received information from pretrial services regarding Candelario–Santana's criminal background. We have seen reports of Defendant's history from the National Crime Intelligence Center (NCIC), as well as the original conviction records from Puerto Rico's commonwealth courts. In addition, a criminal history analysis, dated December 6, 2012, and provided by the Puerto Rico Police Department, confirmed that Defendant has been adjudged guilty of twelve murders. Defendant also has several more felony convictions on his rec-

---

**16.** The government's cross-examination suggested that the reason for Defendant's return to Puerto Rico after a year was voluntary and not as a result of any problems at work. This was uncontradicted by the defense.

**17.** See Dr. Grodzinski's report, Def. Exh. 12 at 3.

**18.** See Dr. Grodzinski's report, which states that Defendant worked for three years maintaining horses in stables, from the ages of 12 to 15. Def. Exh. 12 at 3.

**19.** Defendant's work history was confirmed in his 2008 mental health evaluation by Dr. Torres. That evaluation is discussed below. Gov. Exhibits 4; 14.

**20.** Def. Exh. 2 at 6.

**21.** See Dr. Herrera's testimony. Dec. 7 TR at 68.

ord, including for firearms violations and destruction of evidence. During the hearing, the government and a defense witness agreed that Defendant had been convicted of "some sixty felonies."[22] The list of convictions and brushes with the criminal justice system is the longest and most impressive we have seen in twenty-seven years on the bench.

In January 2008, while in Puerto Rico's commonwealth prison system, Candelario–Santana was examined by mental health professionals. Clinical psychologist Zahira Lespier Torres ("Dr. Torres"), Psy.D., performed the evaluation.[23] Dr. Torres performed a Minnesota Multiphasic Personality Inventory-2 (MMPI-2) and a Raven Progressive Matrices exam. She based her evaluation on a structured clinical interview with Candelario–Santana, clinical observations of him, as well as on information contained in his referring report from the correctional institution.

Dr. Torres' report begins with a short description of Candelario–Santana's legal background. She states that Candelario–Santana indicated he was the chief ("jefe") of a gang, and that after being implicated in a crime, he moved to Michigan to live, where he stayed for several years until he was finally arrested there. She made the following "relevant clinical remarks" about Candelario–Santana: he had a proper appearance and personal neatness; he stated that he understood the purpose of the evaluation; and seemed to be well-oriented in time, place, and self. His thought process was logical and coherent, pertinent to the questions asked. His work rhythm was normal, and he performed the tasks independently. His linguistic expression was clear and with appropriate language.

The interview flowed as anticipated, with Candelario–Santana maintaining eye contact.

The results of Dr. Torres' exams did not indicate any signs of mental retardation. On the Raven test, which measures intellectual capacity using nonverbal exercises, Candelario–Santana obtained a classification of "Average," compared to his age peer group. On the MMPI-2, which measures personality traits and clinical scales that may affect a person's functioning, Candelario–Santana exhibited a profile of "valid." The scales of validity indicated that Candelario–Santana maintained a balance between self-protection and self-exposure, as well as a moderate pretense of looking calm. In her discussion of the results, as well as in her clinical observations, Dr. Torres noted repeatedly that Candelario–Santana appeared to be anxious and reserved during the interview. According to Dr. Torres, Candelario–Santana accepted responsibility for criminal behavior while invoking his right not to elaborate. She drew associations between Candelario–Santana's secretiveness and his lifestyle and surroundings.

In her summary and recommendations, Dr. Torres again noted that Candelario–Santana had "proper average intellectual resources to work and produce." She indicated that clinically, Candelario–Santana did not suffer from any severe pathology. She observed that Candelario–Santana possessed a neurotic, rigid, distant style, consistent with a person very concentrated on himself. Among the "protective factors" that Candelario–Santana had in his favor, Dr. Torres included three factors: An absence of severe pathology, family support, and "intellectual resources." Among the

**22.** Dec. 6 TR at 115.

**23.** A copy of Dr. Torres' report was entered into evidence at the *Atkins* hearing as Government's Exhibit 4. An English translation of the report is available as Government's Exhibit 14.

dynamic factors, Dr. Torres noted: A tendency to avoid managing his emotions, poor introspection, restrictions on his ability to manage friendships, and location and stable work. Her ultimate recommendation, if Candelario–Santana was considered for parole, was preventive psychological follow-up and an occupational adjustment. She also suggested working on Candelario–Santana's social/interpersonal relations with friends and acquaintances.

While incarcerated in Puerto Rico's commonwealth prisons, Candelario–Santana went on to earn his GED.[24] In January 2008, he was selected as the "Student of the Month" in the educational program at the Zarzal Correctional Institution, where he was serving prison time.[25]

A little more than one year later, after serving only six years of a twelve-year murder sentence, Candelario–Santana was released from prison in February 2009. Six months later, on October 17, 2009, the massacre at La Tómbola occurred. On November 10, 2009, the government filed a criminal complaint against Candelario–Santana for two counts of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). (Cr. No. 09–mj–816, Docket No. 3.) In support of the complaint, the government attached an affidavit from FBI Special Agent Kristopher Pagano. (Cr. No. 09–mj–816, Docket No. 3–2.) In his affidavit, Agent Pagano describes evidence that Candelario–Santana illegally possessed a firearm on two occasions, October 17 and November 4, 2009. (Cr. No. 09–mj–816, Docket No. 3–2.) A confidential human source described

seeing Candelario–Santana in the Juana Matos Housing Project in Cataño, Puerto Rico, on November 4, 2009. (*Id.*) The source said that he/she saw Candelario–Santana in possession of a firearm with an extended high capacity magazine in plain view. (*Id.*)

On November 10, 2009, U.S. Magistrate Judge Justo Arenas issued an arrest warrant for Candelario–Santana. (Cr. No. 09–mj–816, Docket No. 4.) On December 16, Candelario–Santana appeared before U.S. Magistrate Judge Camille Vélez–Rivé, under custody of federal agents. (Cr. No. 09–427, Docket No. 10.) We take judicial notice of the following facts surrounding Defendant's capture and arrest one day earlier, on December 15, 2009. *See* Fed. R.Evid. 201(b) (providing that a court may take judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

On December 15, 2009, agents of the U.S. Customs and Border Patrol (CBP) apprehended Candelario–Santana as he and four other individuals approached the shores of St. Thomas, U.S. Virgin Islands, in a private boat. Candelario–Santana initially presented a false identification, providing a Florida driver's license. Federal agents performed biometric tests and determined that the identification was false. Another CBP Agent, Louis Penn, recognized Candelario–Santana as a fugitive sought by authorities in Puerto Rico. Agent Don Severance then placed Candelario–Santana under arrest.

---

**24.** The report from Dr. Margarida indicates that he obtained his high-school equivalency degree. During the hearings, the government repeated its assertion that Defendant received his GED. This was uncontradicted, except for the Defendant's qualification that Defendant got help to do so. Dr. Herrera's report also states that Defendant obtained his GED. Def. Exh. 13 at 3.

**25.** A copy of the ninth-grade equivalency certificate and the Student of the Month award were entered into evidence as Government's Exhibit 4.

Following Candelario–Santana's arrest, federal and commonwealth law enforcement officers held a press conference describing the events. The news was widely reported throughout Puerto Rico at the time. One of Puerto Rico's main television news stations, WAPA TV, produced a television news announcement, available online, which included footage of the press conference held by law enforcement officials. In the video, U.S. Attorney for the District of Puerto Rico, Rosa Emilia Rodríguez–Vélez, is shown describing the arrest and charges against Candelario–Santana, including his status as an armed career criminal.[26] Roberto Escobar, Director of the Immigration and Customs Enforcement (ICE) in Puerto Rico, is also shown discussing the arrest. The circumstances of Defendant's arrest were also reported by the Associated Press[27] and Puerto Rico's leading newspapers, including El Nuevo Día and El Vocero.[28]

In a 52–count third superseding indictment returned in October 2012, defendants [1] Alexis Candelario–Santana, [2] Carmelo Rondón–Feliciano, and [4] Wilfredo Candelario–Santana are charged as members of a criminal organization "whose members engaged in narcotics distribution and acts of violence, including murder and attempt-

ed murder." (Docket No. 579 at 1–2.) The overt acts in furtherance of this conspiracy include twenty-one (21) murders and twenty-one (21) attempted murders. (*Id.;* Docket No. 590 at 3.) Defendants [1] Alexis Candelario–Santana and [5] David Oquendo–Rivas are specifically charged with having committed violent crimes in aid of racketeering activity for nine (9) murders and twenty-one (21) attempted murders. (*Id.*) Nine of the murders charged in the indictment occurred on October 17, 2009, the day of La Tómbola massacre. (*Id.* at 6–7.)

## III.

### *Expert Reports*

The court heard testimony from the following four experts in this case. Each of the experts was qualified as an expert without objection.

### A. *Dr. Margarida*

Dr. María Margarida, Psy.D., was the first expert to testify, on December 6, 2012.[29] She was called by the Defendant. Dr. Margarida is a full-time Professor in the Neurology section of the University of Puerto Rico School of Medicine.[30] In 1986,

**26.** *En la Cárcel Federal Alexis Candelario,* WAPA TV, Primera Plana, December 16, 2009 (available at http://www.wapa.tv/noticias/primeraplana/en-manos-de-la-policia-alexis candelario_20091216090248.html) (last visited January 03, 2012).

**27.** *En la Cárcel Federal Alexis Candelario,* Maritza Cañizares, Associated Press, December 16, 2009 (available at http://xposedmagazine.wordpress.com/tag/alexis-palo-de-goma/) (second article on page) (last visited January 03, 2012).

**28.** *Alexis Candelario Podria Ser Extraditado en Varios Dias,* Osman Perez Mendez, EL NUEVO DIA, December 16, 2009 (available at http://www.elnuevodia.com/alexiscandelario podriaserextraditadoenvariosdias648995.

html) (last visited January 03, 2012); *see also En La Isla Presunto Autor de Masacre de la Tombola,* Limarys Suarez Torres and Ricardo Torres Chico, EL NUEVO DIA, December 16, 2009 (available at http://www.elnuevodia.com/enlaislapresuntoautordemasacrede latombola-649295.html) (last visited January 03, 2012); *see also Arrestan a Alexis Candelario–Santana,* Miguel Puig, EL VOCERO, December 16, 2009, at 22.

**29.** A transcript of Dr. Margarida's testimony is available at Docket No. 697 (Dec. 6 TR).

**30.** Dr. Margarida's curriculum vitae was admitted into evidence as Defense Exhibit 1. Dr. Margarida also described her qualifications and background to the court during her testimony on December 6. (Docket No. 697 at 6.)

she received a Psy.D. degree in clinical psychology from the Massachusetts School of Professional Psychology. She also received a M. Ed. From Harvard University in 1980. In 1986–1987, she was a post-doctoral fellow in neuropsychology at Harvard Medical School. Her current professional activities today are wide-ranging, including teaching, research, consultation, clinical practice, and private practice. Dr. Margarida does not specialize in mental retardation.[31]

Dr. Margarida spent a total of twenty-seven hours with Candelario–Santana during seven separate sessions.[32] She performed a battery of tests using several different instruments. Each of those instruments is listed in her report ("Marg. Rep.").[33] The most important tests were the "EIWA–III," a version of the Wechsler Adult Intelligence Scale III that has been normed for Puerto Rico,[34] and the Vineland II Adaptive Behavior Scales ("Vineland" or "VABS–II" test), which she administered to two relatives of Candelario–Santana.[35] She testified that Candelario–Santana was fully cooperative with the tests and that she found no evidence of malingering.[36]

On the EIWA–III comprehensive intelligence test, Candelario–Santana obtained a full score of 75. (Marg. Rep. at 16.) His verbal score was an 80 and his performance score was a 72. Broken down even further, Candelario–Santana's score was an 84 on verbal comprehension, 79 on perceptual organization, 77 on working memory, and 59 on processing speed. These results are listed in a table at page 16 of Dr. Margarida's report.[37]

Dr. Margarida testified that the EIWA–III was the only comprehensive intelligence test that she performed. Nonetheless, the table of results on page 16 of her report also lists scores scaled for the WAIS III intelligence test. Dr. Margarida explained that even though she did not actually perform the WAIS III, she saw it fit to include scores scaled to that test, because of her belief that the EIWA–III overestimates scores. (Docket No. 697 at 31.) Dr. Margarida also applied the "Flynn effect" to her results, and provided two columns of "Flynn adjusted scores." [38] (Marg. Rep. at 16.)

Dr. Margarida's report also refers to the "second prong" of adaptive behavior. (Marg. Rep. at 19.) To assess Candelario–

**31.** See Dr. Greenspan's "Declaration," Def. Exh. 10 at 1. On cross-examination, the government also established that mental retardation has been a fairly small part of Dr. Margarida's career. (Dec. 6. Tr. at 83–89.)

**32.** A more complete version of the relevant chronology regarding Defendant's *Atkins* defense is set forth in a separate order, see Docket No. 627. As we explained in that order, Defendant has had more than a year since we granted his first motion to appoint a psychological expert in the case. *Id.*

**33.** A full copy of Dr. Margarida's report, as well as sealed copies of the raw data that formed a basis for the report, were entered into evidence as Defense Exhibits 2–8. In this opinion, we refer to "Def. Exh. 2" and "Marg. Rep." interchangeably.

**34.** Dr. Margarida referred to this test the EIWA–III during her testimony. (Docket No. 697 at 28.)

**35.** A full list of the tests Dr. Margarida performed, including the NEUROPSI, can be found in her report.

**36.** The government disagreed with this, citing Dr. Grodzinski's finding of malingering on the Rey 15. (Dec. 6 Tr. at 95–96.)

**37.** Def. Exh. 2 at 16.

**38.** As we discuss in our analysis section, we disregard the Flynn-adjusted scores and the WAIS III scores.

Santana's adaptive behaviors, she relied heavily on two administrations of the Vineland II Adaptive Behavior Scales, which were administered in a "semi-structured interview format with two of Mr. Candelario–Santana's sisters, and score[ ] his performance as he functioned at 17 years, 6 months age." (Marg. Rep. at 21.) To do this, Dr. Margarida flew to Worcester, Massachusetts, where eleven of Candelario–Santana's twelve siblings are now living. (Dec. 6. TR at 41–42.) She spoke to Candelario–Santana's siblings about their memories of Candelario–Santana when he was age seventeen and one-half years old. Dr. Margarida also performed informal adaptive probes of Candelario–Santana, as well as academic probes, including the Woodcock Muñoz III Achievement Test, Spanish Version. (Marg. Rep. at 25–28.) In Dr. Margarida's words, "the information gathered in the standardized assessment was validated by cross referring the informant's responses, with data gathered from informal adaptive probes with Alexis, interviews with collateral sources described earlier, and information from standardized achievement testing using the Woodcock Muñoz Spanish Achievement Battery III." (*Id.* at 21.)

Regarding the third prong of mental retardation, Dr. Margarida again relied heavily on her interviews with Candelario–Santana's sisters in Massachusetts, including the two administrations of the Vineland test. (Marg. Rep. at 30.) She also referred to her academic probes of Candelario–Santana, available records, and interviews with Candelario–Santana and his relatives, which she said indicated the onset of mental retardation before the age of eighteen. (*Id.*)

## B. *Dr. Herrera*

Dr. Jorge Herrera Pino ("Dr. Herrera") was the second expert to testify, on December 7.[39] Dr. Herrera was called by the government. Among many other professional roles, Dr. Herrera is the founder and director of the Miami Neurobehavioral Institute, where he oversees a team of eleven licensed neuropsychologists. Recently he managed a five-year contract from the state of Florida, in which he and his team were responsible for evaluating 5,000 individuals for developmental disability diagnoses. Dr. Herrera estimates that seventy to seventy-five percent of those individuals were evaluated for mental retardation specifically. At the beginning of his career, Dr. Herrera was involved in a large-scale effort to rectify incorrect diagnoses of Hispanic children as mentally retarded by the state of Michigan.

A large portion of Dr. Herrera's career has also involved, up to the present day, international consultation with institutions throughout Spain and Latin America. He sees patients one day a week in addition to his extensive teaching, supervision, consulting, and management responsibilities, which he does for hospitals, universities, and private institutions. He is an Associate Professor and a founding member of the college of medicine at Florida International University.[40] His involvement in the field of neuropsychology stretches some "forty plus years." [41] He has also testified for both the government and defense as an expert in *Atkins* hearings, including approximately ten times for the defense in habeas proceedings.[42] Dr. Herrera has a Ph.D. in Educational and Clinical Neuropsychology from Wayne State University, a

**39.** A transcript of Dr. Herrera's testimony is available at Docket No. 700 (Dec. 6 TR).

**40.** Dec. 7 Tr. at 13.

**41.** Dec. 7 Tr. at 13.

**42.** *Id.* at 14.

Doctor of Medicine from Universidad de Alcalá, Spain, and was a post-doctoral fellow for two years in pediatric and clinical neuropsychology, also at the Universidad de Alcalá, Spain.[43]

Dr. Herrera met with Candelario–Santana for approximately two hours at the Metropolitan Detention Center, where he performed a neuropsychological diagnostic interview. He prepared a report of his analysis, available as Defense Exhibit 13. In his report, Dr. Herrera also analyzed the findings of a 2008 psychological exam done by Dr. Torres (discussed above), and conducted interviews with four individuals who had known Candelario–Santana well for an extended period of time, including in adulthood. Each interview lasted approximately one-and-a-half hours. Dr. Herrera also reviewed the tests performed by Dr. Margarida and Dr. Grodzinski. (Dr. Grodzinski's background and findings are discussed below.) Dr. Herrera also performed an "additional eclectic battery of neuropsychological instruments" to complement the test results performed by Dr. Grodzinski. As we discuss further below, Dr. Herrera determined with a high degree of confidence that Candelario–Santana was not mentally retarded.

## C. *Dr. Grodzinski*

Dr. Jaime Grodzinski Schwartz ("Dr. Grodzinski") was the second government expert to testify, also on December 7.[44] Dr. Grodzinski received a Psy.D. and M. Sc. in clinical psychology, with an emphasis in neuropsychology, from Carlos Albizu University in Miami, Florida. He has also received graduate degrees and licensures in clinical psychology from institutions in Peru and Israel. Presently, Dr. Grodzinski serves as a neuropsychologist examiner for the Veterans Hospital in San Juan, Puerto Rico, and performs clinical and forensic psychological services for several other government entities. Dr. Grodzinski is also an adjunct professor at Carlos Albizu University, and maintains a private practice.[45]

Dr. Grodzinski evaluated Candelario–Santana on three separate occasions, November 13, 19, and 21, for a total of ten hours. The evaluation included a clinical interview, an inquiry into Candelario–Santana's medical and psychological history, and neuropsychological testing. A complete list of the eighteen tests administered by Dr. Grodzinski is available in his report. While "the main source of information was Candelario–Santana himself," Dr. Grodzinski also gathered information from the following sources: The indictment; Candelario–Santana' siblings; the report and raw data by Dr. Margarida; the reports of Drs. Torres[46] and Greenspan; Candelario–Santana's school records, prison records, and vaccinations records; interviews with four individuals who knew Candelario–Santana well; and transcript of phone calls made by Candelario–Santana.

Based on all of this information, Dr. Grodzinski concluded that Candelario–Santana was not mentally retarded. Dr. Grodzinski also concluded that Candelario–

**43.** Copies of Dr. Herrera's curriculum vitae were admitted into evidence as Government's Exhibit 5. Dr. Herrera is not a licensed medical doctor.

**44.** A transcript of Dr. Grodzinski's testimony is available at Docket No. 700 (Dec. 7 TR).

**45.** A more complete list of Dr. Grodzinski's education and professional experiences is set forth in his curriculum vitae, available as Government's Exhibit 8.

**46.** Dr. Grodzinski refers to Dr. Lespier Torres as "Dr. Lespier," her first last name. This is the same report and doctor we refer to as Dr. Torres, see Government's Exhibit 14.

Santana's available records and test results were consistent with post-concussion syndrome and his "psychosocial deprivation" that interrupted his formal education at seventh grade.

### D. *Dr. Greenspan*

Dr. Stephen Greenspan, the final expert, testified on December 21. (Dec. 21 TR.) Dr. Greenspan received a Ph.D. in developmental psychology from the University of Rochester, and was a post-doctoral fellow in mental retardation and developmental disabilities at UCLA. He is currently a Clinical Professor of Psychiatry at the University of Colorado Health Sciences Center, and Emeritus Professor of Educational Psychology at the University of Connecticut. He has a long history of involvement in the mental retardation field, including in the APA and AAIDD. His work has been cited in the relevant manuals of the AAIDD, and he has testified in several court cases involving mental retardation, including several *Atkins* determinations in federal courts. Dr. Greenspan's curriculum vitae is available as Defendant's Exhibit 10.

Dr. Greenspan did not directly examine or interview Candelario–Santana. Instead, Dr. Greenspan provided a "Declaration." In his "Declaration," Dr. Greenspan describes his involvement in the case:

> Although Dr. Margarida is a highly qualified neuropsychologist, she does not specialize in developmental disorders such as mental retardation. Therefore, Mr. Ruhnke engaged my services as a recognized authority on mental retardation, and asked me to examine Dr. Maragrida's [sic] methods and findings, and opine as to whether or not she is on firm ground in her conclusions.

Def. Exh. 10 at 1. Dr. Greenspan says he has performed similar services in other U.S. court cases, also without actually meeting or interviewing the defendants or any witnesses. In his "findings", Dr. Greenspan states his professional opinion that Dr. Margarida "used appropriate methods and information for assessing" the three prongs of mental retardation, and that she "appears justified in her conclusion that Mr. Candelario–Santana" meets the three prongs. Dr. Greenspan briefly discusses the reasons for this professional opinion, and cautions against adopting any stereotype of mentally-retarded people. He also warns against using isolated competencies or accomplishments as evidence of mental retardation. It is not clear from Dr. Greenspan's "Declaration" what information he considered about Candelario–Santana aside from Dr. Margarida's tests.

On December 18, days before his testimony, Dr. Greenspan produced a "Supplemental Declaration." (Def. Exh. 10A.) At the hearing and in subsequent briefings, the defense made almost no reference to this "Supplemental Declaration." We have reviewed the Supplemental Declaration, and found it to be speculative, inconsistent, and unhelpful. The unhelpfulness of Dr. Greenspan's Supplemental Declaration is consistent with his otherwise limited, biased and unprofessional involvement in this case. The Supplemental Declaration reviews the reports of Drs. Grodzinski and Herrera and adds additional thoughts about their reports. Our determination that Dr. Greenspan is completely lacking in credibility precludes us from giving any weight to the assertions in his Supplemental Declaration.

 Under Rules of Evidence 702 [47]

---

**47.** Rule 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness quali-

and 703 [48], this court has a duty to "ensure that any and all scientific testimony or evidence admitted ... is reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). We enjoy wide latitude in determining how to assess an expert's reliability, and we are not limited to the specific factors outlined in *Daubert* or any other case. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 138, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *United States v. Shay*, 57 F.3d 126, 132 (1st Cir. 1995) ("A district court's decision to admit or exclude expert testimony is entitled to great deference."); *United States v. Brien*, 59 F.3d 274 (1st Cir.1995) ("[T]rial judges have traditionally been afforded wide discretion to admit or exclude expert evidence.").

■ We found Dr. Greenspan's testimony suffered from extreme deficits to the extent that it was fundamentally unreliable. We conclude that it cannot be used as evidence in rendering our decision today.

First, Dr. Greenspan's testimony contained considerable errors that suggest a certain carelessness and slipshod disregard for the seriousness of our present inquiry. For example, Dr. Greenspan's declaration, which he signed under penalty of perjury, states unequivocally that he reviewed Dr. Margarida's final report. (Docket No. 600.) Yet he admitted to the court that he was actually not sure whether he had read her final report (dated the same day as his declaration) or an earlier, non-final draft. (Dec. 21 TR at 80.) Also, Dr. Greenspan's declaration states that he

has personal knowledge of its contents—including his laudatory endorsement of Dr. Margarida's professional qualifications and reputation. In fact, Dr. Greenspan told the court that he had no personal knowledge of Dr. Margarida's credentials and only knew of her accomplishments through her CV and some casual internet research. (Dec. 21 TR at 84–5.) It is alarming that Dr. Greenspan would make such misstatements to the court, and we can only conclude (at best) that he was careless in crafting his statements under oath to this court. This behavior unto itself is not consistent with the rigorous standards of diligence and honesty this court requires of expert testimony.

Second, Dr. Greenspan was combative and evasive throughout his testimony despite being admonished to be more forthcoming with his answers. (Dec. 21 TR at 69, 71, 73, 76, 78, 86, 87, 88, 93, 98, 103, 105, 109, 113, 114, 182, 211.) Dr. Greenspan's evasiveness continued even when he was answering questions about his own testimony on cross-examination. (Dec. 21 TR at 111–12.) Dr. Greenspan's testimony before this court contradicted testimony he has given elsewhere on prior occasions and scholarly writings he has published specifically addressing *Atkins* hearings. (Dec. 21 TR at 120–122.) On a prior occasion, Dr. Greenspan said that those diagnosed with mild mental retardation cannot read. But before this court he said his previous statement was incorrect and that he should have said that the mentally retarded cannot read "well." (Dec. 21 TR at 89–91.) He referred to this discrepancy as

fied as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion or otherwise." Fed. R.Evid. 702; *see also Shay*, 57 F.3d at 132.

**48.** Rule 703 provides: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those per-

ceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." Fed.R.Evid. 703.

"a little thing." (Dec. 21 TR at 89.) Dr. Greenspan also testified in another case that the mental "age" of one diagnosed with mild mental retardation would never be higher than between the age equivalent of eight and eleven. (Dec. 21 TR at 90–91.) Before this court he testified that it would be twelve. (Dec. 21 TR at 90–92.) In his declaration, Dr. Greenspan wholesale endorsed Dr. Margarida's methods and findings. (Docket No. 600.) But in his testimony he found certain aspects of Dr. Margarida's methods, including her use of the Vineland Adaptive Behavior Scales, "inappropriate." (Dec. 21 TR at 177.)

Finally, Dr. Greenspan seemed unwilling or unable to explain evidence that tended to refute his conclusions and offered little explanation during his testimony as to why he thought the government's experts' assessments were incorrect. (Dec. 21 TR at 111, 113.) He did, however, resort to ad hominem attacks on the governments' experts' professional qualifications as a replacement for scientific evidence and arguments. (Dec. 21 TR at 184.)[49] Moreover, Dr. Greenspan criticized certain methods employed by the government's experts, including IQ screening tests, that he himself has used in the past. (Dec. 21 TR at 139.) In the end, Dr. Greenspan delayed the proceedings unnecessarily and attempted to prevent the government from conducting meaningful cross-examination for the benefit of the court.

We do not dispute that Dr. Greenspan can qualify as an expert in this field—certainly his academic credentials and the many plaudits he has received from his professional peers mark him as such. But that does not mean that his testimony before *this court* was reliable. To the contrary, Dr. Greenspan's testimony before *this court* failed to meet the high standards of scientific reliability and evidence demanded in his field. *See Kumho Tire Co., Ltd.*, 526 U.S. at 152, 119 S.Ct. 1167 (reliability can be measured by whether the expert has employed in the courtroom "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"); *Milward v. Acuity Specialty Products Group, Inc.*, 639 F.3d 11, 26 (1st Cir.2011). Dr. Greenspan was evasive and unhelpful in addressing the court's questions. He gave no explanation to refute contrary opinions or to support his own opinions when challenged. He gave testimony that contradicted his own prior statements and gave no explanation for having changed his mind. Perhaps most fundamental of all, he told the court under oath that he was familiar with Dr. Margarida's final report, when in fact, he did not know whether he had looked at a preliminary draft or the final version. Whatever Dr. Greenspan's professional credentials, it is clear he did not bring them to bear on his testimony and reports before this court.

We note this mismatch between Dr. Greenspan's credentials and his performance here as a warning to other courts who

---

**49.** It is worth noting that Dr. Greenspan exhibited contemptuous disregard for the work of the government's experts. Sadly, this seems entirely consistent with Dr. Greenspan's estimation of his and his colleague's singular importance in *Atkins* proceedings: "Our revised position is that 'clinical judgment is all right when it is used correctly, by us, but is not all right when it is used incorrectly, by experts other than us. As we are not able to participate in every *Atkins* case in America, it would probably be better if constraints were placed on the use of clinical judgment." Stephen Greenspan & Harvey N. Switzky, *Lessons from the Atkins Decision for the Next AAMR Manual* in WHAT IS MENTAL RETARDATION?: IDEAS FOR AN EVOLVING DISABILITY IN THE 21ST CENTURY 281, 289 (S. Greenspan & H.N. Switzky eds., 2006).

may yet hear his testimony in the future. Dr. Greenspan serves as an expert in cases of this sort across the country, and such service demands an impeccable professional reputation. Carelessness and evasiveness have no place in any courtroom, yet Dr. Greenspan has demonstrated those characteristics amply here, and may do so again elsewhere.

## IV.

### Analysis

In this section, we analyze our findings with respect to each of the three prongs of mental retardation: (1) sub-average intellectual functioning; (2) adaptive behaviors; and (3) onset before the age of 18. *Atkins,* 536 U.S. at 318, 122 S.Ct. 2242.

### A. Prong One: Sub-average Intellectual Functioning

In *Atkins,* the Court stated that a "national consensus has developed against" executing persons with a "known IQ" of less than 70. 536 U.S. at 316, 122 S.Ct. 2242. The Court also observed that "an IQ score of between 70 and 75 or lower" is "typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." *Id.* at 309 n. 5, 122 S.Ct. 2242 (citing 2 Kaplan & Sadock's Comprehensive Textbook of Psychiatry 2952 (B. Sadock and V. Sadock eds. 7th ed.2000)). This five-point margin between 70 and 75 is due to the standard error of measurement in administering the test. *See Hooks,* 689 F.3d at 1168 (noting that a "five-point range" applies on either side of the results); *see also Atkins,* 536 U.S. at 308 n. 3, 122 S.Ct. 2242 (noting that mild mental retardation is a condition "typically used to describe people with an IQ level of 50–55 to approximately 70.")

Candelario–Santana was administered a series of tests measuring his cognitive functioning—both by his own expert and by experts acting on behalf of the government. The court was presented with an IQ score from one comprehensive IQ assessment and a variety of other cognitive assessment tests administered over a period of several months, between February and October of 2012. On the full-scale IQ test Candelario–Santana scored a 75, which exceeds the range typically considered to be mentally retarded. On some sections of the comprehensive IQ test, however, Candelario–Santana scored significantly below a 75, which could be indicative of mental retardation. The testimony of Drs. Herrera and Grodzinski, however, convinces us that this is not the case.

### 1. Candelario–Santana's IQ Score

Dr. Margarida, an expert for the defense, administered the "Escala de Inteligencia de Wechsler para Adultos—Tercera Edicion" ("EIWA–III") to Candelario–Santana on March 15, 2012.[50] (Def. Exhibit 2 at 16.) The EIWA—III is recognized as a model tool for intelligence testing among Spanish-speakers. *See* Nicholas S. Thaler & Sharon Jones–Forrester, *IQ Testing and the Hispanic Client* in GUIDE TO PSYCHOLOGICAL ASSESSMENT WITH HISPANICS, 88 (Lorraine T. Benuto, ed., 2012). The EIWA–III is a Spanish-language adaptation of the Wechsler Adult Intelligence Scale–Third Edition (WAIS–III), and it includes the subtests and constructs that are the foundation of WAIS–III testing. *Id.* However, unlike the WAIS–III, the EIWA–III was adapted and standardized

---

**50.** While Dr. Margarida included scaled scores from the WAIS–III in her report, she did not administer this test at any time to Candelario–Santana. (Dec. 6 TR at 31.) We decline to consider the scaled WAIS–III scores included in her report.

specifically to Puerto Rico. The third edition was developed in cooperation with the Ponce School of Medicine in Puerto Rico to ensure the language and items were culturally appropriate for Puerto Ricans speaking Spanish. *See* Brigida Hernandez, Elizabeth Horin & et alia, *Psychological Testing and Multicultural Populations* in RACE, CULTURE, AND DISABILITY: REHABILITATION SCIENCE AND PRACTICE (Fabricio E. Balcazar, Yolanda Suarez–Balcazar, et alia eds., 2010).

The EIWA–III was the current version of the test at the time Dr. Margarida assessed Candelario–Santana. (Dec. 7 TR at 29.) The test administered by Dr. Margarida consisted of a global scale and several subscales or subtests, grouped into two general categories, "verbal" and "performance". (Dec. 6 TR at 30) After administering the EIWA–III, Dr. Margarida found Candelario–Santana to have a Full Scale IQ of 75. In addition, Dr. Margarida found Candelario–Santana to have a Verbal IQ of 80 and a Performance IQ of 72. (Def. Exh. 3 at 1.)

The government experts credited Dr. Margarida's raw scores and her administration of the EIWA–III test. (Dec. 7 TR at 23–24.) We see no reason to disagree with this expert consensus. Furthermore, since the EIWA–III is itself recognized as a mainstream IQ test devised specifically for Puerto Ricans, we see no reason to doubt its suitability in these circumstances.

### 2. *Criticism of IQ Score by Drs. Herrera and Grodzinski*

■ Although we credit Dr. Margarida's administration of the test and the raw data it generated, we do not necessarily credit all of Dr. Margarida's interpretations of that data. The government's experts testified that, contrary to Dr. Margarida's conclusions, the Flynn effect should not be applied here and that Candelario–Santa-

na's low score on the processing speed subtest of the EIWA–III was better explained by several traumatic brain injuries he sustained, rather than an overall subaverage intellectual functioning. We agree with the government's experts on both points.

■ The Flynn Effect is a phenomenon named for James R. Flynn, who discovered that the population's mean IQ score rises over time, by about a third of a point each year. According to Flynn, if an individual's test score is measured against a mean of a population sample from prior years, then that individual's score will be inflated in varying degrees (depending on how long ago the sample was first employed) and will not provide an accurate picture of his IQ. *See, e.g., Walton v. Johnson,* 440 F.3d 160, 177 n. 22 (4th Cir.2006) (en banc) ("The premise of the 'Flynn Effect' is that IQ scores increase over time and that IQ tests that are not renormed to take into account rising IQ levels will overstate a testtaker's IQ score."); James. R. Flynn, *Tethering the Elephant: Capital Cases, IQ, and the Flynn Effect,* 12 PSYCHOL. PUB. POL'Y & L. 170, 172 (2006) ("Naturally, judges want to know whether defendants were actually two standard deviations below their peers at the time they were tested and *not* how they rank against a group selected at some random date in the past." (emphasis added)). *See generally* James R. Flynn, *The Mean IQ of Americans: Massive Gains 1932 to 1978,* 95 Psychol. Bull. 29 (1984). Flynn posited that a downward adjustment to scores is necessary when a test without current norms is used. *See* Flynn, *Tethering the Elephant, supra,* at 174–75.

However, the Flynn Effect remains highly controversial and many courts have declined to accept its application. *See Thomas v. Allen,* 607 F.3d 749, 757 (11th

Cir.2010) ("[T]he Flynn Effect is a statistically-proven phenomenon, although no medical association recognizes its validity."); *Maldonado v. Thaler*, 625 F.3d 229 (5th Cir.2010) ("Neither this court nor the [Texas Criminal Court of Appeals] has recognized the Flynn Effect as scientifically valid."); *Williams v. Mitchell*, 2012 WL 4505774, *34–36 (N.D.Ohio 2012) (holding that a state court's failure to adjust an IQ score to take in account the Flynn Effect was not contrary to clearly established federal law for purposes of 28 U.S.C. § 2254(d)(1); "[C]ourts have held that 'there is no scientific consensus' on the validity of the Flynn Effect."); *see also* Leigh D. Hagan, Eric Y Drogin and Thomas J. Guilmette, *IQ Scores Should Not Be Adjusted for the Flynn Effect in Capital Punishment Cases*, JOURNAL OF PSYCHOEDUCATIONAL ASSESSMENT (2010); George C. Denkoski and Kathryn M. Denkowski, *WAIS–III IQs of Criminal Defendants with Mental Retardation Claims Should Not Be Reduced for the 'Flynn Effect'*, AMERICAN JOURNAL OF FORENSIC PSYCHOLOGY (2007); Alan S. Kaufman, *In What Way Are Apples and Oranges Alike? A Critique of Flynn's Interpretation of the Flynn Effect*, JOURNAL OF PSYCHOEDUCATIONAL ASSESSMENT (2010); Michael Shayer and Denise Ginsburg, *Thirty Years On–A Large Anti–Flynn Effect?*, BRITISH JOURNAL OF EDUCATIONAL PSYCHOLOGY (2009);

As the government's experts demonstrated, the EIWA–III test administered to Candelario–Santana was not an old test in need of being "renormed." Recently revised in 2008, the EIWA–III was (and is) a test for contemporary Puerto Ricans and scaled specifically to that population. (Dec. 7 Tr. at 26–31.) Furthermore, the government's experts could not point to a single instance in their professional experience where they applied, or could recall a colleague's application of, the Flynn Effect. (Dec. 7 TR at 31.) Moreover, defense's

own experts differed about how to apply the Flynn Effect properly and how many points a proper Flynn Effect adjustment would give to Candelario's IQ score. (Dec. 21 TR at 87.) Under such circumstances, the Flynn Effect has no relevance to our inquiry and we agree with the government's experts that it should not apply here. *See Hooks*, 689 F.3d at 1170 (concluding that neither *Atkins* nor any other U.S. Supreme Court decision mandates the application of the controversial Flynn Effect).

In her report, Dr. Margarida included a scoring sheet that listed Candelario–Santana's raw and scaled scores from each of the eleven subtests that comprise the EIWA–III. (Def. Exh. 2 at 15.) Raw scores are the actual scores achieved on each subtest. *See United States v. Smith*, 790 F.Supp.2d. 482, 491 (E.D.La.2011). Scaled scores are raw scores converted into a standardized score, the final score on the test for that category. *Id.*

The scaled scores Candelario–Santana achieved on the administration of the EIWA–III subtests are grouped into four general categories: "Verbal Comprehension," "Perceptual Organization," "Working Memory," and "Processing Speed." The scores Candelario–Santana received in these four categories were remarkably consistent, save for one obviously outlying score measuring Candelario–Santana's processing speed. (Dec. 7 TR at 34.) Without processing speed, the scaled scores from the three general categories listed in Dr. Margarida's report are clustered around a median score of 80.

Based on the scores Dr. Margarida obtained from her administration of the EIWA–III, Candelario–Santana scored a 59 on processing speed. (Def. Exh. 2 at 15.) That score is significantly lower than his scores for each of the other three

categories. Because a single outlying score is uncommon, Drs. Herrera and Grodzinski conducted additional tests on Candelario–Santana to determine if any clinical reasons, including mental retardation, might explain this outlying score.

Drs. Herrera and Grodzinski administered a battery of tests—eighteen separate tests, in fact—aimed at further examining Candelario–Santana's deficient processing speed. (Def. Exh. 11.) In the course of their tests, Drs. Herrera and Grodzinski determined that, in addition to processing speed impairment, Candelario–Santana had poor hand-eye coordination and memory impairment. (Dec. 7 TR at 36–37.) For example, Candelario–Santana scored very poorly on the Grooved Pegboard Test, which is strongly indicative of underlying motor and eye-hand coordination difficulties. (Def. Exh. 13 at 12.)

One of the tests administered by Dr. Grodzinski was the Test of Nonverbal Intelligence ("TONI–IV"). The TONI–IV is a general assessment of intelligence and provides evaluative data of non-verbal learning process, abstract reasoning, and problem solving. (Def., Exh. 11 at 6.) The TONI–IV helps evaluate subjects with questionable or limited language ability. (Dec. 7 TR at 55.) Dr. Grodzinski administered the TONI–IV as a tool that could corroborate the hypothesis that Candelario–Santana suffered from impaired motor skills and sub-average processing speed. (Dec. 7 TR at 54.) The test was not administered as a tool for determining a comprehensive measurement of Candelario–Santana's intelligence. *Id.* At the hearing, defense counsel raised questions about the manner in which Dr. Grodzinski scored his administration of the TONI–IV. According to the TONI–IV diagnostic manual, testing should stop when a subject incorrectly answers three successive questions. (Dec. 7 TR at 167.) But, when

Candelario–Santana incorrectly answered three questions in a row, Dr. Grodzinski had him continue the test.

Dr. Grodzinski explained why he did not follow the specific directions of the diagnostic manual in this particular case: he had suspicions that Candelario–Santana was malingering. Malingering is "intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as avoiding work, obtaining financial compensation, evading criminal prosecution, or obtaining drugs." *See* AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS: DSM–IV 683 (4th ed.1994). At the hearing, Dr. Grodzinski testified that Candelario–Santana exhibited a "failure attitude" or "frustration attitude" throughout testing, indicating that Candelario–Santana would frequently indicate that a task was too hard for him and that he could not do it. (Dec. 7 TR at 164–65.) But Dr. Grodzinski also found that, with encouragement, Candelario–Santana often could complete the requested tasks, and often complete them quite well. Dr. Grodzinski also noticed fluctuations in Candelario–Santana's performance on similar tasks, even some that were familiar to him. Where Dr. Grodzinski expected to see a "practice effect" [the influence of prior test-taking, which generally results in higher scores during a second administration] Candelario–Santana would actually produce results much lower than expected the second time around. (Dec. 7 TR at 166.) Candelario–Santana would read a question very slowly, even though it was a question he had read before. Sometimes, he would read new information very quickly. This behavior can be indicative of malingering. *See U.S. v. Smith,* 790 F.Supp.2d 482, 497 (E.D.La. 2011) (describing typical malingering tactics-saying "I don't know" or "I can't" after answering only a few questions).

Even if the individual is not malingering, this behavior still indicates to a clinician that extra encouragement and more testing may produce different results—the testing subject might need encouragement in order to succeed, or might benefit from multiple attempts at similar tasks, rather than accepting an initial failing result.

We acknowledge that Dr. Grodzinski was exercising his professional judgment in continuing the test despite the diagnostic manual's contrary instructions. Since we are not considering Candelario–Santana's specific score on the test, we do not need to deal with the question of whether or not that specific score is accurate based on the test's diagnostic manual and administrative instructions. Rather, for our purposes, we only note that the test was performed as a means of further analyzing the cause of Candelario–Santana's disproportionately low score on the processing subpart of the EIWA–III test.

Drs. Herrera and Grodzinski also interviewed Defendant and gained additional information allowing them to understand Candelario–Santana's impairments more fully. Specifically, they learned that Candelario–Santana suffered head trauma of some kind during the course of his amateur boxing career and during a serious motorcycle accident in which Candelario–Santana was not wearing a helmet. Also, there was no history of mental retardation in Candelario–Santana's family. Based on these facts, set alongside Candelario–Santana's scores in the other categories of the EIWA–III and the additional testing they performed, Drs. Herrera and Grodzinski concluded that Candelario–Santana likely suffered from a cognitive impairment that limited his ability to "put the motor act into effect." (Dec. 7 TR at 37.) Or, in other words, an impairment that clinicians might associate with brain trauma, but that in no way limits Candelario–Santana's "ability to think, to discern, to think rationally, act with purpose." (*Id.*)

In all of this, we remember that, as noted by Dr. Margarida, evaluating a person's mental capacities is both an art and a science. (Dec. 6 TR at 96.) While all of the tests administered by the respective experts are valuable assessment tools, they are just that: tools. Dr. Herrera made the same point in his testimony, when he stated: "[T]ests don't make a diagnosis, just as much as x-rays don't make a diagnosis." (Dec. 7 TR at 34–5.) A final diagnosis is only "as good as the thinking process of the ... health care professional that has to make the determination." *Id.* We have considered the different professional determinations that Drs. Margarida, Herrera, and Grodzinski detailed before this court, recognizing that each professional assessment reflects both the art and the science of psychological evaluation. Given all of the testimony we have heard, we conclude that the best explanation of the data before the court is that Candelario–Santana does not exhibit sub-average intellectual functioning.

### B. *Prong Two: Adaptive Functioning*

In *Atkins,* the Court did not provide a firm definition of adaptive behavior limitations. Instead, the Court again referred to clinical definitions, which it said require "significant limitations in adaptive skills such as communication, self-care and self-direction that manifest before age 18." *Id.* at 318, 122 S.Ct. 2242. In a footnote, the Court cited the APA and AAMR [51] definitions. *Id.* at 308 n. 3, 122 S.Ct. 2242. As one district court has observed, the two

---

**51.** As noted above, the AAMR has since switched its name to the AAIDD. The AAIDD published a new edition of its manual in 2010.

See AAIDD, Intellectual Disability: Definition, Classification, and Systems of Supports (11th ed.2010) (the "AAIDD Manual") at 43.

classifications "essentially measure the same skills."[52] *United States v. Davis,* 611 F.Supp.2d 472, 490 (D.Md.2009).

In its third footnote in *Atkins,* the Court described the key features of adaptive behavior limitations as defined by the AAMR and APA. According to the AAMR definition, a person meets prong two if he has "related limitations in two or more of the following adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work." *Atkins,* 536 U.S. at 308 n. 3, 122 S.Ct. 2242 (citing MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 5 (9th ed.1992)). The APA definition is "similar": according to the DSM–IV–TR, a person meets prong two if he has "significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Id.* (citing DSM–IV 41 (4th ed.2000)).

■ The most recent version of the AAIDD Manual provides a similar definition of adaptive behavior, which is divided into three categories: conceptual, social, and practical. *AAIDD, INTELLECTUAL DISABILITY: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS* (11th ed.2010) (hereinafter the "AAIDD Manual") at 43. Conceptual skills include receptive and language skills; reading and writing; and money, time, and number concepts. *Id.* at 44. Social skills include interpersonal skills, social responsibility, self-esteem, gullibility, naiveté, follows rules/obeys laws, avoids being victimized, and social problem solving. *Id.* The practical category involves activities of daily living (personal care), occupational skills, use of money, safety, health care, travel/transportation, schedules/routines, and use of the telephone. *Id.* at 44. We find this definition essentially similar to the ones referenced by the Court in *Atkins,* which we take as our primary reference point and authority. In any case, we have considered both sets of standards—the ones referenced by the Court in *Atkins,* as well as the more recent definition in the AAIDD Manual—and we find that under either definition, Candelario–Santana has failed to show that he suffers from significant adaptive behavior limitations.[53]

■ Many courts have noted, correctly, that "[a]daptive behavior is a broader category, and more amorphous, than intellectual functioning." *Davis,* 611 F.Supp.2d at 491; *see also Smith,* 790 F.Supp.2d at 505. Because of the relative subjectivity of the adaptive behavior analysis, the importance of clinical judgment becomes greater under prong two than under prong one. When assessing adaptive behaviors, therefore, courts must make their own independent determinations of the clinicians' judgment and credibility. *See Davis,* 611 F.Supp.2d at 491 (noting importance of assessing information that goes to "the relative credibility of the experts" in the case); *Smith,* 790 F.Supp.2d at 505 ("the Court must rely on its assessment of the relative competence and credibility of the

52. The district court in *Davis,* 611 F.Supp.2d at 475 n. 1, referred to the 2002 "AAMR Manual," as well as the supplemental AAMR "User's Guide," published in 2007 (citing AAMR, MENTAL RETARDATION: DEFINITION. CLASSIFICATION, AND SYSTEMS OF SUPPORT 8 (10th ed.2002); MENTAL RETARDATION: DEFINITION, CLASSIFICATION AND SYSTEMS OF SUPPORT (2007)). We see no great difference between the definitions of adaptive behaviors provided by the Court in *Atkins* and the later Manuals.

53. Dr. Margarida cites the 2010 AAIDD Manual repeatedly in her report.

individual experts"). This function has long been performed by district courts when weighing the testimony of dueling experts. *Bruce v. Weekly World News*, 310 F.3d 25 (1st Cir.2002) ("Accordingly, the district court, qua factfinder, was entitled to make the crucial credibility determination as between the competing expert witnesses.").

In the same vein, we relied here on our own assessment of the experts in this case. Several factors that we discuss below convinced us that Drs. Herrera and Grodzinski exercised better and more informed clinical judgment than Drs. Margarida and Greenspan. Partly, that was because of the more reliable and comprehensive information that went into Dr. Herrera's analysis. We were also unimpressed by Dr. Margarida's unsatisfactory explanations for why she ignored much relevant evidence. In *Part III.D.*, above, we discussed our determination that Dr. Greenspan was severely lacking in credibility.

Another important factor in our analysis was the relative disparity in each of the psychologists' backgrounds in mental retardation. In the words of Dr. Greenspan, Dr. Margarida does not specialize in developmental disorders, such as mental retardation. (Def. Exh. 10 at 1.) Comparatively, Dr. Herrera has an extensive background in evaluating children and adults for mental retardation. Indeed, one of the early formative experiences in his career responded to the State of Michigan's incorrect diagnoses of mental retardation in Hispanic children. Since then, he has led teams that are responsible for evaluating thousands of patients for mental retardation. Dr. Grodzinski also has extensive clinical and forensic experience diagnosing mental retardation for legal purposes in Puerto Rico. Thus, to the extent we had to resolve disputes between the two experts, we were comfortable relying on the long and distinguished experience of Drs. Herrera and Grodzinski.

The government has filed a brief, (Docket No. 729), arguing that this court should adopt a list of six factors that the Texas Court of Criminal Appeals uses to evaluate adaptive behavior under prong two of Atkins. *See Ex Parte Briseno*, 135 S.W.3d 1, 8–9 (Tex.Crim.App.2004). We agree that some of these six factors are logical considerations in evaluating a defendant's adaptive behavior limitations. For example, the first and third factors ask whether the people who knew him best believed him to be mentally retarded, and whether his conduct revealed someone who led or was led by others. *Id.* at 8. These two considerations are consistent with the clinical definitions cited in *Atkins*. Although Dr. Herrera did not refer to or consider *Briseno*, some of the same considerations informed his analysis, for example Defendant's qualities as a leader and the way he was perceived by his peers. However, some of the other four *Briseno* factors track the *Atkins* criteria less closely, and in any case, *Briseno* has not guided our analysis here. Instead, we have relied principally on the Supreme Court's language in *Atkins*, as well as our own independent assessment of expert testimony. In this regard, we found Drs. Herrera and Grodzinski to be very helpful and credible. The defense, on the other hand, failed to present a credible and persuasive account of Defendant's adaptive behavior limitations.

The defense repeatedly stressed the notion that "[i]ndividuals with an [intellectual disability] typically demonstrate both strengths and limitations in adaptive behavior." AAIDD Manual at 47. In the process of diagnosing mental retardation, the AAIDD Manual does caution that "significant limitations in conceptual, social or practical adaptive skills is [sic] not out-

weighed by the potential strengths in some adaptive skills." *Id.* This concept is related to Dr. Greenspan's warnings against adopting an incorrect stereotype of mentally retarded people or inferring too much from apparent successes. As we explained in our introduction, *Part I.B*, we reject the notion that we are bound by clinical standards prescribing what evidence we may and may not consider of Defendant's adaptive behaviors. *See Hooks*, 689 F.3d at 1168 (noting that a "clinical standard is not a constitutional command").

But even if we did confine our analysis to the relevant clinical standards, we would find that Defendant's account lacks credibility. It may be true as a general matter that one should not infer too much from specific examples of a person's apparent successes. But the defense experts' repeated failures to probe the circumstances that produced Candelario–Santana's many apparent successes gave us pause. For example, Dr. Margarida referred to Defendant as a "very limited historian," but apparently took on faith his assertion that he had help in achieving his GED. Her failure to investigate the circumstances surrounding his high school equivalency degree, or his repeated moves to and from various locations in the mainland, undermined her assertion that such successes cannot be considered. In the end, we were convinced that the defense presented a selective and overly narrow view of the evidence. The analysis of Drs. Herrera and Grodzinski struck us as far more persuasive, fair and comprehensive than the one offered by the defense. In the two sections below, we first discuss the report by Dr. Margarida, and then turn to the analysis of Drs. Herrera and Grodzinski.[54]

### 1. *Dr. Margarida's Assessment*

We have several criticisms of Dr. Margarida's assessment of Candelario–Santana's adaptive behavior. Our chief criticism is her heavy reliance on the poorly conceived Vineland tests that she administered. The subjects of the test were two of Candelario–Santana's siblings, Erica Betancourt and Mildred Rivera Santana, who provided information about Candelario–Santana's behaviors when he was seventeen and one-half years old.

The Vineland test appears to be the primary foundation for Dr. Margarida's finding that Candelario–Santana's adaptive behaviors were indicative of mental retardation. She devotes almost twice as much room in her report to the Vineland tests than she does for her academic probes of Candelario–Santana's current adaptive behavior functioning. She also begins her report with her findings of Candelario–Santana at age seventeen, which he says are corroborated with current limited observations.

Dr. Margarida's heavy reliance on the Vineland tests is not sufficient to support her determination that Defendant has significant adaptive behavior limitations. Her report provides no assessment of his present-day adaptive behaviors to ground a finding of mental retardation under the second prong. The educational results, conversations with relatives who knew him when he was a child, and the sparse records available are much less probative of his present day adaptive behaviors than other indications she could have, and should have considered, but did not. The focus of prong two should be on present day adaptive behaviors, not the distant memories of how an individual performed trivial daily tasks more than twenty years ago.

**54.** In Part IV of this opinion, we compare the shortage of evidence presented here to other cases in which defendants have been found mentally retarded.

On page twenty of her report, addressing adaptive behaviors, Dr. Margarida attempts to justify her approach. There she notes: "**Retrospective diagnosis** is a common issue in Atkins related cases were [sic] a determination of intellectual and adaptive functioning prior to the age of 18 is needed." (Marg. Rep. at 20) (emphasis in original). For this proposition, she cites her own Appendix, which does include two paragraphs describing the situations in which retrospective diagnoses may be appropriate. (*Id.* at 34.)

The Appendix notes that the Vineland–II Adaptive Behavior Scales (VABS II) is one of two instruments that experts consider the "gold standard" for assessing adaptive behavior. (*Id.*) The Appendix then goes on to state that experts "strongly recommend that these instruments be used retrospectively to assess the individual's adaptive behavior prior to or as near as possible to the age of 18 *in order to meet the third criteria for a diagnosis of mental retardation* (Olley & Cox in press)." (emphasis added).

That last sentence is key to understanding our disagreement with Dr. Margarida. As her own Appendix acknowledges, retrospective diagnoses are appropriate to determine whether an individual "meet[s] the third criteria for a diagnosis of mental retardation." (*Id.*) In other words, retrospective diagnosis may be necessary to determine whether a forty-two year old individual suffered from mental retardation before the age of eighteen. Of course, that only makes sense, in the context of the third criterion. The third prong of the mental retardation definition clearly states that to be mentally retarded, an individual's condition must have an onset before the age of eighteen.

We are also aware of case law and professional literature approving of the use of retrospective diagnosis to evaluate prong two. *See Davis*, 611 F.Supp.2d at 491 (citing AAMR User's Guide); AAIDD 2010 Manual at 46. The literature also recommends using a standardized assessment tool such as a Vineland II in this context. DSM–IV–TR at 42. Such tools can be useful especially when evaluating someone who is incarcerated.[55] But we think that in this context, the Vineland test that Dr. Margarida performed was too unreliable, and lacked sufficient corroborating evidence, to ground a finding of mental retardation under prong two. We say this for several reasons.

First, we have serious concerns regarding Dr. Margarida's selection of these two sisters as the Vineland subjects. As the government made clear during its cross-examination of Dr. Margarida, one of these individuals, Erica Betancourt, was a very young child, only nine years of age, when Defendant was seventeen years old.[56] And both she and the other sister interviewed,

---

**55.** Dr. Margarida alluded to some of the difficulties of evaluating incarcerated people in her report. These challenges include the fact that individuals with mental retardation may overestimate their own abilities and lack awareness of their own limitations, referred to by Dr. Margarida as the "cloak of confidence." (Def. Exh. 2 at 20.) Another limitation is that interviews of prison personnel may not be useful, because adaptive behavior limitations may be harder to identify in highly structured, predictable environments such as prison. (*Id.*)

**56.** In its cross-examination of Dr. Margarida, the government pointed out that one of Defendant's sisters was only nine years old at the time Defendant's behaviors were observed at age seventeen and one-half. This chronology is confirmed in Dr. Margarida's report, which notes that Erica Betancourt Santana was 34 years old at when she spoke with Dr. Margarida. Candelario–Santana is today 41 years old. Def. Ex. 2 at 9.

Mildred, spoke only to memories of the Defendant formed at least twenty-four years earlier. We attach little reliability to these memories because of the large gap in time between then and now. Moreover, the defense provided very little information that would bolster the credibility or reliability of these two sisters' memories.

Even according to the criteria from the DSM–IV–TR and AAIDD Manual, which Dr. Margarida cited, we do not think these two women were the best subjects she could have chosen. For example, the AAIDD Manual provides that the information should be gathered from "persons who know the individual well." *Id.* at 47. Generally, "individuals who act as respondents should be very familiar with the person and have known him/her for some time and have had the opportunity to observe the person function across community settings and times." AAIDD Manual at 47. The guidance from the DSM–IV–TR is similar. It recommends gathering "evidence for deficits in adaptive functioning from one or more reliable independent sources (e.g., teacher evaluation and educational, developmental, and medical history)." *Id.* at 42.

Defendant has given us no reason to believe the recollections of these two sisters are either reliable or independent. Moreover, there is no indication that these two sisters even knew Defendant well from the time he was seventeen to forty-one years old. In fact, Dr. Margarida's report states that she was "careful that [the sisters] only considered his performance prior to age 18 and not as he may have developed later in life." (Marg. Rep. at 23.) This chronological gap is significant for at least three reasons. First, it ignores the time during which Candelario–Santana is alleged to have shown considerable adaptive skills as the leader of a gang. Second, it leaves out any consideration of whether Defendant has adaptive behavior limitations currently, which is the proper focus of prong two. Third, the passage of twenty-four years' time between the sisters' recollection and now naturally makes their memories less reliable, as stated above.

There are still more flaws in Dr. Margarida's report. The report provides little reason to believe that these two sisters had an adequate basis to observe Defendant even *before* the age of eighteen. Erica was a nine-year old at the time, and the only information about Mildred is that she "is one of the closest siblings to Alexis and one of the informants that was able to provide adaptive functioning information." (Marg. Rep. at 9.) The descriptions of Defendant's behavior, set forth in a section called "Discussion of Informant's Specific Responses On the VABS–II," provide almost no context to bolster their reliability. (Marg. Rep. at 24–27.) Instead, the section reads as a three-page series of one-sentence declarations, with few, if any, supporting details. Dr. Herrera testified that these two subjects were poorly chosen respondents for a Vineland test, because they were only eighteen years and nine years old at the time, and could not "look at him as a child when they themselves were adults." (Dec. 7 TR at 73.) Because adults are often better able to assess a child's adaptive behavior, the ideal respondents in a Vineland would be parents or other adults who know the child well. Even Dr. Greenspan admitted in his testimony that Erica was not a proper subject for the Vineland.

The government's experts both testified that Dr. Margarida's reliance on her Vineland test was a serious flaw in her analysis. We agree. Dr. Herrera testified that with this particular defendant, he would not have made a retrospective use of the Vineland test at all. Dr. Herrera also

described the retrospective use of the Vineland as "controversial." Dr. Grodzinski also wrote that this technique was one of "several flaws" in Dr. Margarida's report.[57]

The testimony of Dr. Herrera on this point was particularly instructive:

> It does not make any sense to go back if there is no determination of disorder or impairments in adaptive behaviors. And now I mean the issue between, for instance, adult onset diabetes and childhood onset diabetes is crucial. The prognosis is totally different. The intervention needs to be much more aggressive. But if there's no diabetes now, then there's no sense asking questions about the onset of the diabetes in childhood.

(Dec. 7 TR at 57.)

Even if it were properly administered with reliable subjects, the Vineland would be only one part of a person's overall adaptive behavior profile. As Dr. John Gregory Olley[58] has acknowledged, "the process of assessing adaptive behavior, particularly in a retroactive sense, 'is a matter of drawing information from many sources, all of which are imperfect.'" *Davis*, 611 F.Supp.2d at 492 (quoting J. Gregory Olley, The Assessment of Adaptive Behavior in Adult Forensic Cases: Part 2, PSYCHOLOGY IN MENTAL RETARDATION AND DEVELOPMENT DISABILITIES (American Psychological Association/Division 33, Washington, D.C.) (Fall 2006)). Given the imperfect and amorphous nature of evaluating adaptive behaviors, courts have adhered to the "relative consensus that the best way to retroactively assess Candelario–Santana's adaptive functioning is to review the broadest set of data possible, and to look for consistency and con-

vergence over time." *Davis*, 611 F.Supp.2d at 492 (reviewing literature on best practices for assessing adaptive behavior).

On this score, Dr. Margarida clearly failed to carry her burden. There are several key indications of Candelario–Santana's adaptive behaviors that she did not address at all. Dr. Margarida either did not consider, or dismissed out of hand, suggestions that any of the following might be indicative of Candelario–Santana's adaptive behaviors: Candelario–Santana's work history, both licit and illicit; his repeated moves to and from Brooklyn, Detroit, and Puerto Rico; his successful completion of a GED while incarcerated; his ability to fix cars and change filters and brake pads; or the facts that he admitted to being a "chief" of a large gang, had pled guilty to several murders, and was found to possess "average intellectual resources" by a state psychologist in 2008. Dr. Margarida simply ignored the indictment's allegations that Candelario–Santana was head of a "large criminal organization" that netted several thousand dollars a day and committed at least twenty murders to advance its goals. Perhaps most importantly, one wonders why Dr. Margarida chose to perform the Vineland test on two of Candelario–Santana's sisters, yet declined to perform the test, or even conduct an in-depth interview with, anyone who knew Candelario–Santana well during the last twenty-four years.

In these respects, we found the government's cross-examination of Dr. Margarida to be very effective. The government elicited several explanations from Dr. Margarida about different pieces of evidence that she did not consider or did not reference in her report. We found many of Dr. Margarida's explanations unsatisfactory, un-

---

**57.** Def. Exh. 11 at 8.

**58.** Dr. Margarida cites Olley in her report.

convincing or contradictory. The effect of these varying admissions was to detract from Dr. Margarida's credibility and the validity of her report.

First, the government asked Dr. Margarida if she had not considered Defendant's illicit employment as a drug dealer and manager of a drug point. In response, she stated:

A. No, that's considered. It's just that it's impossible to ascertain.

Q. Really? Did you ask him?

A. I did not.

*Id.* at 112.

Her explanation for this omission was as follows: "I don't think that I need that information to get to a conclusion." *Id.* at 113. The government then asked whether she would find it relevant to a person's adaptive functioning if they were able to run a successful drug operation for ten years that was purchasing drugs by the kilo. This time, Dr. Margarida provided yet another explanation, stating that she was "not an expert in identifying the cognitive functions needed to do that." *Id.* Pressed further, Dr. Margarida then stated that while she did know some of the tasks involved, there was an absence of research showing "exactly what intellectual skills, if any, are needed to run a drug point." *Id.* at 116.

Dr. Margarida then explained: "Whether he ran the point after 18 is not what I needed to consider to make the diagnosis." *Id.* at 117. Logically, then, the government asked Dr. Margarida if she asked Defendant's sisters whether Candelario–Santana began dealing drugs before the age of 18. *Id.* at 118. Dr. Margarida admitted that she did not ask. *Id.*

The cumulative effect of all of these admissions was very damaging to the reliability and credibility of Dr. Margarida's analysis in the court's eyes. Moreover, it seems clear to us that a person's work history running a drug point successfully for ten years would be relevant to their adaptive functioning. For example, Dr. Margarida cited to the 2010 AAIDD Manual. We think that being the "jefe" of a gang for sixteen years would indicate mastery of adaptive skills found in this definition. These include conceptual skills, such as money, time and number concepts; social skills, including gullibility, naiveté, avoids being victimized; and practical skills, such as occupational skills, use of money, safety, health care, travel/transportation, schedules/routines, and use of the telephone. AAIDD Manual at 44. Using the criterion from *Atkins,* we think it clear that such activities would have some bearing on a person's "communication, self-care and self-direction." *Atkins,* 536 U.S. at 318, 122 S.Ct. 2242.

Moreover, we reject Dr. Margarida's assertion that she had "no way of analyzing things that are allegations and that I have no access to." Her admission that she did not even ask Defendant or his sisters about his past as a drug dealer, or consider the allegations in the indictment, contradict this explanation. The government also pointed out that Defendant has two siblings who live in Puerto Rico that she could have talked to. (Docket No. 697 at 126.) Dr. Margarida did not speak with either one of them. (*Id.*) No explanation was provided for this omission, except for Mr. Ruhnke's suggestion on re-direct that it would have been inappropriate for her to speak with his brother, who is a codefendant in the case.

Another highly relevant source that Dr. Margarida failed to consider, but could have, was the 2008 report by Dr. Torres. On cross-examination, Dr. Margarida admitted that she did not consider this report because it was not provided to her. (Dec. 6 TR at 122–124.) We find this

omission highly significant for at least two reasons. First, the report further undermines Dr. Margarida's assertion that Defendant's gang leadership were simply "allegations that [she] ha[d] no access to": in the evaluation by Dr. Torres, Defendant admits to being the "jefe" of a gang. (Gov. Exh. 14.) Even more importantly, though, Dr. Torres' report notes that Defendant possessed "average mental resources to work and produce." In fact, the report lists his intellectual resources as one of Candelario–Santana's protective factors. The government and Dr. Margarida had a brief colloquy about why she would not have been provided with this evaluation, since the government claims to have produced it to defense counsel two years ago. (Dec. 6 TR at 123–124.) Whatever the reason, Dr. Margarida's failure to consider the evaluation certainly adds to the sense that she did not consult—nor did she properly consider—a full panoply of relevant evidence.

To be clear, we reject Dr. Margarida's assertions that only Defendant's behaviors before the age of eighteen should count towards her adaptive behavior determination. We also reject her assertion that only his legitimate work history should be considered. But even if we did agree with these two assumptions by Dr. Margarida, we find that her analysis would still miss the mark. On cross-examination, the government challenged her on this point, by discussing Defendant's work history and his successful moves to and from at least four different locations on the mainland United States before he was eighteen years old. (Docket No. 697 at 106–111.)

The government pointed out that Candelario–Santana was able to move to and from Florida, Brooklyn, Massachusetts, and Michigan, successfully landing on his feet each new location, despite Candelario–Santana's very limited English skills and lack of familiarity with these cities when he arrived. *Id.* at 106–8. In New York, Candelario–Santana even worked successfully for one year in a full-time job. He chose to return to Puerto Rico not because he had been fired or could not handle life in New York, but simply because he wanted a change. Defendant was also able to buy a truck and start his own business delivering merchandise, which he did for a year.

Dr. Margarida was unwilling to acknowledge that any of these successes might be evidence of Defendant's adaptive behaviors. *Id.* The defense repeatedly argued that it would be unfair to infer too much from these apparent successes, because not enough was known about what kinds of help Defendant had to achieve these things. But again, we are unwilling to accept such an explanation, absent some sign that Dr. Margarida tried to find out what could have caused the successes. It was incumbent on the defense to at least make a good faith effort to consider the Defendant as a whole, rather than just rehearsing boilerplate from clinical manuals. Drs. Herrera and Grodzinski both disagreed with Dr. Margarida's judgment in these respects, and so do we. We turn to the analysis of the government psychologists now.

### 2. *Reports by Drs. Herrera and Grodzinski*

For several reasons, we found the analysis of Drs. Herrera and Grodzinski much more persuasive than that of Drs. Margarida and Greenspan. To begin with, Dr. Herrera personally met with four individuals who had long relationships with Candelario–Santana and knew him well over a long period of time. Dr. Herrera met with each person for an hour-and-a-half; the redacted descriptions of his interview are

available in his report.[59] In some cases, these individuals had known Candelario–Santana from his childhood until 2009, when the massacre at La Tómbola occurred. Some had grown up and spent their whole lives in the same neighborhood where Candelario–Santana is from. We have read the un-redacted reports of the information Dr. Herrera gained from these individuals.

We find the information provided by these individuals very informative, credible, and probative of Candelario–Santana's adaptive behaviors. We also believe that the picture these individuals paint of Defendant is far more complete and reliable than the one given by Dr. Margarida and Defendant's two sisters. First, these individuals that Dr. Herrera spoke with described Candelario–Santana as they knew him throughout their lifetimes, including up to the time that Defendant allegedly committed the massacres at La Tómbola. These individuals were not speaking of Defendant only as he existed at age seventeen. Second, the descriptions provided by these individuals were based on their fresh memories of Defendant as he behaved in 2009. Naturally, then, these memories are more reliable than the ones offered by Defendant's sisters, told to Dr. Margarida twenty-four years after the fact. Third, these individuals were all adults when they formed their impressions of Defendant; none of the four individuals were offering only memories that they had formed as small children, as Erica did. Fourth, these individuals did not limit themselves to describing Defendant's legal behaviors. Their observations and experiences describe living in a neighborhood where Candelario–Santana directed a large and violent drug organization. We

find these observations much more revealing than discussions in Dr. Margarida's report about how well Defendant could cook and wash his clothes as a seventeen-year old boy.

In his testimony, Dr. Herrera summarized the feedback he received from these individuals about Candelario–Santana:

> [A]gain, the description across the board for four people independently without being prompted or asked specific questions, at first it was that this gentleman runs a very successful, prosperous business, or at least did run for a substantial part of his adult life; and that even though he may have gone to prison and come back, he was still considered to be the boss and asserted himself to be the boss. So that would be the general understanding of adaptive functioning.

(Dec. 7 TR at 68.) Dr. Herrera went on to testify that some of these individuals described Candelario–Santana as "brilliant," not at all gullible, and possessing "very good mathematical skills for counting money and making sure the weights were correct and all of that." (*Id.* at 69–70.) Dr. Herrera further testified that when asked whether they believed Candelario–Santana was mentally retarded, these individuals were incredulous. At least three had strong reactions indicating they thought Dr. Herrera would have to be kidding to ask such a question. One referred to Candelario–Santana as "nobody's fool."

Based in part on these conversations, Dr. Herrera concluded that Candelario–Santana was a leader, not a follower. In his interviews with the individuals who knew Candelario–Santana well, Dr. Herrera asked whether Candelario–Santana was someone who is gullible, easily led, or easily fooled. These traits are some of the

---

**59.** Def. Exh. 13 at 4–8. The identifying information of these individuals has been kept confidential because of concerns for their

safety. In two separate orders, we have explained our rationale for keeping this information confidential. (Docket Nos. 701; 722.)

indicators of adaptive behavior deficits. As Dr. Herrera testified, "The responses were dramatically no, no way, okay? If this is a follower rather than a leader? No way. He perceives himself as the boss, the leader." Upon questioning, Dr. Herrera then added that Candelario–Santana not only was perceived as the boss, but was "feared as such in the business."[60]

Dr. Herrera indicated that he was "somewhat taken aback" by these "unrehearsed, spontaneous manifestations" that he heard so consistently. In the face of such strong evidence of Candelario–Santana's adaptive behaviors, Dr. Herrera found it unnecessary to administer the Vineland on any of these individuals. Dr. Herrera testified that while he brought the test with him to these meetings, after receiving such strong evidence of Candelario–Santana's adaptive behaviors, he folded up the test, seeing "no need to explore further."

Dr. Herrera also stated that Candelario–Santana's frequent moves to and from various locations in the mainland provided further evidence of Candelario–Santana's successful adaptive behaviors. Again, we agree. Asked whether he believed Candelario–Santana suffered from adaptive behavior limitations under prong two of the *Atkins* analysis, Dr. Herrera responded "Categorically No." He further indicated that he was 100 percent certain that Candelario–Santana was not mentally retarded. (*Id.* at 76.) The question whether Candelario–Santana had onset before the age of eighteen—the third prong of the definition—became "moot" after this determination. (*Id.*)

Dr. Grodzinski, after meeting with and examining Defendant, as well as reviewing the relevant records and reports, concluded that Candelario–Santana did not meet prong two. Dr. Grodzinski stated during his testimony that he believed in this result "completely strongly" with "a hundred percent" confidence. (Dec. 7 TR at 187–191.) He came to this conclusion on the basis of his observations, records review, statements made by Defendant, clinical impressions, past interviews, and Defendant's life history. (*Id.*)

Dr. Herrera noted that he "never saw anything here that addressed impairment other than low educational achievement."[61] Apart from the Vineland tests Dr. Margarida administered to Defendant's sisters, she also relied on her academic assessments of Defendant. We agree with Drs. Herrera and Grodzinski that Candelario–Santana's poor academic and educational performance is just as easily explained by other factors. These doctors found that Candelario–Santana's poor performance on academic and educational tests was likely attributed to Defendant's decision to drop out of school in the seventh grade; to family and economic pressures that interfered with his studies; to his hyperactivity and restlessness; or to his poor attendance and unruly behavior.

Dr. Grodzinski summed up many of these pressures when he explained that Defendant's educational achievement suffered as a result of his growing up in a "psychosocially deprived environment." (Dec. 7 TR at 175.) Dr. Herrera testified that he believed Candelario–Santana "started with a syndrome of hyperactivity and attention deficit." (Dec. 7 TR at 76.) He also noted that Candelario–Santana was a self-described restless, hyperactive child. *Id.* Ample evidence suggests that each of these factors inhibited Defendant's academic growth. We find each of these to be more plausible explanations for Candelario–Santana Santana's low educational

---

**60.** Dec. 7 Tr. at 68–69.

**61.** Dec. 7 TR at 59.

scores than Defendant's claim of mental retardation.

Moreover, the academic test results that Dr. Margarida reported are contradicted by several pieces of other evidence. First, Dr. Grodzinski testified that Candelario–Santana's performance on the 2008 MMPI–2 required basic reading skills of a sixth or seventh grade level.[62] The Aphasia Screening Test also indicated that Defendant's reading, writing, spelling and math skills were okay.[63] The GED that Defendant obtained while incarcerated also suggests that he was capable of high-school level academic achievement. Therefore, it is simply not credible to think that Dr. Margarida's test results were an accurate reading of Defendant's abilities. The clear indications of malingering that Dr. Grodzinski found, for example on the Rey 15 and Beck Anxiety Inventory tests, suggest that Candelario–Santana may have been malingering on other tests as well.

Drs. Herrera and Grodzinski both concluded that prong two was not a close call. Dr. Grodzinski said he was 100 percent confident in that judgment, based on his clinical observations, available records, Dr. Herrera's interviews, and Defendant's history. (Dec. 7 TR at 187–190.) We agree with the judgment of Drs. Herrera and Grodzinski. Although Drs. Herrera and Grodzinski did not mention Defendant's arrest as a fugitive in St. Thomas, we think this fact would provide even further indication of Candelario–Santana's many adaptive behavior strengths. We emphasize that even without considering the evidence of Candelario–Santana's arrest, there was more than enough evidence to conclude that Defendant does not meet prong two.

As the APA states, "[m]ental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning." DSM–IV at 42. We have seen no credible evidence of any significant adaptive limitations in Candelario–Santana that would suggest mental retardation. Candelario–Santana has simply failed to carry his burden of demonstrating by a preponderance of the evidence that he suffers from significant limitations under this prong. On this basis alone, then, we would have enough reason to find Candelario–Santana not mentally retarded.

## C. *Prong Three: Onset Before the Age of 18*

■ Drs. Herrera and Grodzinski both testified that because Candelario–Santana does not show signs of being mentally retarded presently, this third prong becomes moot. We agree. Moreover, even if we were to closely inquire into this third prong, we think the evidence of Candelario–Santana's mental retardation during childhood is very thin. As we stated above, the twenty-four year passage of time weakens the reliability of the testimony of Candelario–Santana's sisters. Candelario–Santana's poor academic performance is just as easily explained by his troubled family life and unruly behavior as it is by any mental deficiencies. But because of our above findings that Candelario–Santana is not mentally retarded presently, any deeper analysis under this prong is unnecessary.

## V.

### *Conclusion*

Our independent analysis under the relevant three prongs has convinced us that

---

**62.** Dec. 7 Tr. at 184.

**63.** *Id.*

Candelario–Santana is not mentally retarded. Having explained those reasons, we also want to note the differences between the facts presented here and many of the other cases cited by Defendant as model *Atkins* determinations. In Point Seven of his Omnibus Motion, (Docket No. 564 at 140–141), Defendant points the court to several "exhaustive opinions describing the analysis and the extensive nature of expert testimony and social-history investigation these cases require." *Id.* (citing *Smith,* 790 F.Supp.2d 482; *United States v. Lewis,* 2010 WL 5418901 (N.D.Ohio, December 23, 2010); *U.S. v. Hardy,* 762 F.Supp.2d 849 (E.D.La.2010); *Davis,* 611 F.Supp.2d 472; *Sablan,* 461 F.Supp.2d 1239 (D.Colo.2006); *Allen v. Wilson,* 2012 WL 2577492 (S.D.Ind. July 3, 2012)).

We have reviewed each of these cases, all of which found that the defendant met the *Atkins* criteria of mental retardation.[64] But even a brief discussion of the facts in several of these cases makes clear that each of the defendants showed many more signs of mental retardation than Candelario–Santana.

For example, in *Smith,* 790 F.Supp.2d at 491, "[bo]th psychologists found Smith to have a Full Scale IQ of 67" after administering the WAIS III. These scores were before applying the Flynn adjustment. *Id.* Contrast that with the one examination here that yielded a Full Scale IQ of 75. With respect to adaptive behavior, the court found the defendant in *Smith* had a "simple lack of ability to compete at the levels he sought" in school, the Job Corps, the U.S. Navy, and in his work history. *Id.* at 524. The court also found the defendant to be a follower rather than a leader,

noting his lack of participation in clubs, extracurricular activities or athletics. *Id.* Here the situation could hardly be more different: Candelario–Santana seems to have done quite well in the pursuits he chose, including boxing, his licit work experience, ability to purchase and operate a vehicle, successful pursuit of a GED in prison, and many other examples. Candelario–Santana was consistently described by people who knew him as a leader, not a follower. Moreover, the alleged crime committed by the defendant in *Smith* was an armed bank robbery resulting in death, not a sophisticated, longstanding criminal conspiracy.

The same disparities are apparent when comparing *Davis,* 611 F.Supp.2d at 489 to the present case. In *Davis,* the defendant had obtained "consistently low scores on IQ tests" over a seventeen-year period. Detailed school records also showed the defendant had a word recognition grade level of 2.5 at age 12, indicating "severe and pervasive intellectual and academic deficits." *Id.* at 489–490. Candelario–Santana can point to no such track record here, either in school records or past IQ tests.

Further, the adaptive behavior determination of the two defense experts in *Davis* was much more comprehensive than the one offered by Dr. Margarida. *Id.* at 495–497. In *Davis,* to assess the defendant's adaptive behaviors, defense psychologists spoke with the defendant's parents, niece, daughter, older half-brother, former girlfriend who lived with him, four former teachers or tutors, and a former co-worker. *Id.* at 496. The portrait that emerged, based on observations of the defendant at various stages of his life, includ-

---

**64.** In *Sablan,* 461 F.Supp.2d 1239, the court ruled that the *Atkins* determination would be determined pre-trial, with the defendant bearing the burden of proof by a preponderance.

See page 2 of this opinion. The defense also cited one unpublished case without any Westlaw or Lexis–Nexis citation, which we have not reviewed.

ing adulthood, indicated significant deficits in at least seven of ten DSM–IV–TR criteria. *Id.* Comparatively, the information presented by the defense here is several orders of magnitude less probative, in terms of the reliability of the witnesses, their knowledge of defendant and relationship to him, the time period surveyed, and the level of detail.

A similar comparison can be drawn between this case and *U.S. v. Lewis,* 2010 WL 5418901 (N.D.Ohio, December 23, 2010). In *Lewis,* the defense presented a much more detailed and reliable portrait of defendant than the one we have here. In *Lewis,* the defendant was only twenty-five years old, making it much easier for the court to rely on observations of Defendant when he was seventeen years old. In fact, Dr. Greenspan testified to that effect in the case, noting that the use of the retrospective diagnosis had an advantage, because so little time had passed since the evaluation of Defendant at age seventeen. *Id.* at *21. It seems only logical that the use of a retrospective diagnosis here would be much less reliable, given that twenty-four years, rather than eight, have passed since the cutoff age. Moreover, the defense in *Smith* cited testimony from many witnesses who knew the defendant well in the time leading up to the crime. These included the defendant's mother, aunt, sister, and the defendant's teacher in his juvenile detention program. Again, the picture of defendant the defense presented here is much less comprehensive, and based on a selective and narrow view of the evidence.

Finally, we have reviewed *Allen v. Wilson,* 2012 WL 2577492 (S.D.Ind. July 3, 2012) and find it fundamentally different than the case we are presented with here. In *Allen,* the defendant had obtained two IQ scores of 68 and 70 as a child, and was recommended to "be placed in a special education class for the mentally retarded." *Id.* at *3. Here, the first IQ test (of a 75) was registered after Candelario–Santana had been charged in this case, when he was forty-one years old. There is no indication that any of his teachers believed he suffered from mental retardation.

In sum, the defense has simply failed to meet its burden of demonstrating that Candelario–Santana is mentally retarded. For the foregoing reasons, we find that Candelario–Santana does not meet the definition of mental retardation under *Atkins.* This case will proceed as a death-penalty eligible prosecution. Candelario–Santana's motion (Docket No. 564) will be denied.

Candelario–Santana's motion, (Docket No. 564), is hereby **DENIED.** The agreed-upon schedule remains the same, with jury questionnaires to be filled out beginning on January 8, 2013.

**IT IS SO ORDERED.**